# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
# AT JACKSON
## April 14, 2009 Session

## STATE OF TENNESSEE v. JOHN BRUNNER

### Direct Appeal from the Criminal Court for Shelby County
### No. 07-02047    Chris Craft, Judge

### No. W2008-01444-CCA-R3-CD  - Filed July 17, 2009

The defendant, John Brunner, was convicted by a Shelby County Criminal Court jury of second degree murder and domestic assault. He was sentenced as a Range I, violent offender to concurrent terms of twenty-three years, six months and eleven months, twenty-nine days. On appeal, he argues that (1) the evidence was insufficient to sustain his conviction for second degree murder; (2) the trial court erred in admitting the victim's eviction letter to the defendant into evidence; (3) the trial court imposed an excessive sentence; (4) the trial court erred by failing to merge the domestic assault conviction with the second degree murder conviction; and (5) cumulative error entitles him to relief. After our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and J.C. MCLIN, JJ., joined.

Andre B. Mathis (on appeal) and Robert Parris (at trial), Memphis, Tennessee, for the appellant, John Brunner.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Senior Counsel; William L. Gibbons, District Attorney General; and Karen Cook and Robert Ratton, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

This cases arises out of the July 2006 strangulation death of the defendant's eighty-two-year-old mother, Opal Brunner, for which the defendant was indicted on one count of first degree premeditated murder and one count of domestic assault. The defendant did not dispute that he killed his mother, but he asserted that he did so in self-defense after she hit him with her cane.

## State's Proof

Jo Ann McBrien, the defendant's sister and victim's daughter, testified that she visited the victim weekly and spoke to her daily prior to her death. The victim was eighty-two years old and in poor health; she was blind and could only walk with a cane or other aid. The victim's caretaker built a ramp off the back porch of the house to aid in the victim's mobility. McBrien recalled that her father died approximately a year and a half before her mother's murder, and her father and mother had lived in separate residences on the same property due to her father's snoring. Her father lived in the main house, and her mother lived in a small house on the property that she called "her castle." After her father died, the victim moved back into the main house and the defendant moved into the small house previously occupied by the victim. McBrien said that after her father died, the victim gave some of her father's hand tools to McBrien's son and his "johnboat" and trailer to her caretaker.

McBrien testified that she last saw her mother a week before her death and talked to her on the telephone twice the day she died, July 23, 2006. She called the victim's house around 7:00 p.m. that night, but no one answered, so she called the defendant to inquire into the victim's whereabouts. The defendant told her that the victim was asleep, and the two had a "normal conversation." The next morning, the defendant called McBrien and informed her that he had found the victim dead in the backyard. McBrien immediately went to the victim's house where she saw the defendant sitting on the front porch smoking a cigarette, mouthing the words "I didn't do it." McBrien acknowledged that the victim and the defendant had fights when the defendant was a teenager, like "everybody does when they're growing up."

Bennie Crowder, the victim's caretaker, testified that he worked for the victim first as a carpenter and then as her full-time caretaker after her husband died. One of his responsibilities was to take the victim to her doctor's appointments. He assisted the victim in walking to his vehicle and then utilized her wheelchair to take her from his vehicle into the doctor's office. He said that the victim could not walk outside without some kind of assistance and held onto things indoors to help her balance. The ramp he built for the victim was approximately seventeen feet long, and he never witnessed her walk the distance in the last month of her life. The victim was also legally blind.

Crowder testified that approximately a month before the victim died, he installed a bolt lock on the inside of her bedroom door. Crowder identified an eviction notice signed by the victim that the victim had him write to the defendant. He sent the letter by certified mail to the defendant at the address of the victim and the defendant. The letter, dated June 27, 2006, ordered the defendant to vacate the victim's property by July 20, 2006.

On cross-examination, Crowder testified that the ramp he built for the victim had handrails so she could hold onto the rails and walk. He never saw the victim walk with a cane even though she had canes in her home. In the last month of the victim's life, Crowder never saw her outside in the yard unless he was taking her to the doctor. Asked if he had reason to believe the victim and

defendant argued, Crowder said "[o]nly what she told me" but admitted that they never argued in his presence.

Deputy Anthony Scott Chambers with the Shelby County Sheriff's Department testified that he responded to a "DOA call" at 6884 Commander Road in Millington on July 24, 2006. Officer Allen Smith was already on the scene when he arrived, and the defendant was sitting on the front porch. Deputy Chambers observed the victim's dead body lying face-up in the backyard and helped secure the scene.

Sergeant Robert Butterick with the General Investigation Bureau of the Shelby County Sheriff's Department testified that he was called to the scene at 6884 Commander Road to investigate the death of the victim. Sergeant Butterick photographed the scene and prepared a sketch of the area. He noted that the victim was not wearing any shoes and her socks were partially off her feet. From the smaller house in which the defendant resided, Sergeant Butterick recovered a cattle prod with a blond hair on it and a letter from the victim advising the defendant he was being evicted. Officers recovered a cane from the defendant's possession, a cane from the defendant's residence, and two canes from the victim's bedroom.

Samuel Rooker testified that he met the defendant in February 2007 when they were in jail together. He noted that the defendant was able to walk "[p]retty good." According to Rooker, the defendant told him that he was in jail for "matricide," meaning he killed his mother. The defendant was worried that his sister would get the victim's assets when she died, and he did not want "that bitch . . . getting what [he] kissed ass for fifty years." Rooker recalled that the defendant told him that his father had said his cars, tools, and other belongings were going to be the defendant's, but after he died some things were given to other people instead. The defendant told Rooker that his plan was for the victim to put all of her belongings in his name and then put her in a nursing home. After the victim would not agree to go to a nursing home, the defendant considered "zapping her with a cattle prod."

Rooker testified that the defendant told him that he killed the victim by choking her. The defendant explained to Rooker that he grabbed the victim high on throat like he had learned in a self-defense class, tripped her to the ground with his leg, and, when she fought back, used his other hand to pin her shoulder down. The defendant told Rooker that the incident occurred around 6:00 p.m., but he did not call the authorities and tried to "make it look like there wasn't [a] struggle." The defendant then "messed around until about eight [the next] morning before he called . . . his sister." The defendant told Rooker that he could not believe he had killed his mother and had tried to make it look like an accident. The defendant never expressed regret for killing the victim. Rooker admitted that he had been convicted of approximately ten felonies.

Dr. Karen Chancellor, chief medical examiner with the Shelby County Medical Examiner's Office, testified that she performed the autopsy of the victim on July 24, 2006. The victim had bruises and scrapes on her neck, bruises on her face and both arms, and lacerations on the left side of her scalp, left hand, and the back of her right shoulder. Asked if she could determine when the

injuries occurred, Dr. Chancellor stated that "[t]hey appear to have occurred near the time of death or at the time of death." The internal examination of the victim revealed, among other things, that the victim's hyoid neck bone was fractured.

Dr. Chancellor testified that the victim's injuries were consistent with manual strangulation and blunt force trauma to the head. In her opinion, the victim was struck at least six times on the back of the head. Dr. Chancellor stated that strangulation generally has to last around two or three minutes in order to cause death, but unconsciousness would ensue in eight to twelve seconds. She noted that the victim's death may have occurred sooner given her age and health. Dr. Chancellor concluded that the victim's death "resulted from strangulation which caused lack of blood flow to the brain and resulted in her death. She also had some blunt force injuries on the back of the head that contributed to her death."

Sergeant Vernon Dollahite, Jr. with the Shelby County Sheriff's Department testified that he was assigned to the General Investigation Bureau in July 2006 and was the lead case officer in the investigation of the victim's death. Sergeant Dollahite took a witness statement from the defendant in which the defendant denied any involvement in the victim's death. After Sergeant Dollahite learned that the victim's cause of death was strangulation and blunt force trauma, he took another statement from the defendant in which the defendant admitted killing the victim after she attacked him with her cane. At the time of the interview, Sergeant Dollahite did not observe any bruises or contusions on the defendant but noted that the defendant had an obvious "medical condition." Sergeant Dollahite recalled that some witnesses had informed him that there had been difficulties between the defendant and the victim.

## Defendant's Proof

The defendant testified that his family was not very affectionate during his childhood. Both of his parents, but primarily his father, disciplined him with spankings approximately once a month. After spending four years in the Navy Reserves, the defendant earned a degree in accounting and had worked as an accountant and bond salesman. He stated that he suffered from a host of medical conditions, including, among other things, Legionnaires' Disease, a burst blood vessel in his brain, a heart attack, and he had had triple bypass surgery. His relationship with the victim had been "[k]ind of stressful [and] [t]ense" over the years. He described the victim as "controlling" and said she wanted things done her way.

The defendant testified that his financial situation deteriorated due to his medical problems, causing him to move back to the victim's home in December 2005. Not long after he moved in, their relationship worsened because the victim "was just always yelling, always trying to be in control[.]" He noted that the victim questioned his smoking and cleanliness. The defendant said he was taking antidepressant and anti-anxiety medications that were prescribed by his psychiatrist, as well as heart and blood pressure medications, at the time he killed the victim. The defendant said he had difficulty balancing but could walk without a cane "once [he] . . . g[o]t going[.]" He stated that the victim

could not walk very well without the aid of a cane or stick and would at times go outside using those items for support.

The defendant testified that his statement to police was an accurate account of what happened on the day of the victim's death, except he "probably hit her more than [he] said in that statement" but was embarrassed to admit he hit his mother with a cane. He recalled that the victim had followed him out of the main house and started hitting him with her cane. He grabbed her cane and pulled it away from her, then used it to hit her "more than a couple of times." He said he "just kind of lost it" because he wanted her to stop. He admitted that he probably could have gotten away from her until the point she grabbed his arm. The defendant stated that he checked on the victim's body a number of times during the night "to be sure she wasn't being disturbed by like squirrels or something." He called 911 the next morning.

On cross-examination, the defendant testified that the victim was small-framed and weighed 105 pounds and that he weighed approximately 190 pounds at the time of the murder. He acknowledged that the victim allowed him to live in the small house rent and utility free, but he was supposed to start paying for utilities in July, the month the victim was killed. He admitted that the victim called the police on him the month before her death, and he said he had the "impression that [the victim] was scared of [him] at times." He also admitted that he received an eviction notice from the victim in mid-July 2006. However, according to the defendant, he talked to the victim about the letter and she told him he did not have to move if he started taking his medicine regularly. He claimed that although he had the resources to move out at that point, he did not want the victim to be left alone.

Recalling the day of the murder, the defendant testified that he got into an argument with the victim in the kitchen around 6:00 p.m. He left the main house and walked to the bottom of the ramp in the backyard where the victim caught up with him and started hitting him with her collapsible cane. He did not know how many times she made contact with his body. He grabbed the cane from the victim and used it to hit her "a number of times." The two fell over and landed beside each other on the ground, with the defendant's left arm under the victim's neck. He then grabbed the victim's neck with his right hand and squeezed it for approximately one to two minutes until the victim was rendered unconscious.

The defendant admitted that he left the deceased victim outside and did not summon help. He acknowledged that his sister called about an hour after the incident asking about the victim, and he told her that the victim was fine and in bed. He looked out on the victim several times during the night to make sure she was not being disturbed and, at 2:00 a.m., noticed that bruises were starting to appear. He left at 5:00 a.m. to buy cigarettes and, sometime between 7:00 and 8:00 a.m., called the police to report the victim's death. He explained that he called at that time "because it was daylight and [he] felt like they could see what had happened and would have a clear view." The defendant said he did not call the night before because he was in shock and did not know what to do. He stated that he was embarrassed that he had killed his mother and asserted that he loved her and did not intend to kill her.

The jury convicted the defendant of the lesser-included offense of second degree murder as well as domestic assault.

## ANALYSIS

### I. Sufficiency of the Evidence

The defendant challenges the sufficiency of the convicting evidence. When reviewing a challenge to the sufficiency of the convicting evidence, we note that the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Second degree murder is defined as "[a] knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1) (2006). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Id. § 39-11-302(b). "[A] knowing second degree murder is strictly a 'result-of-conduct' offense. . . . [T]he 'nature of the conduct' that causes death is inconsequential." State v. Page, 81 S.W.3d 781, 787 (Tenn. Crim. App. 2002) (citing State v. Ducker, 27 S.W.3d 889, 896 (Tenn. 2000)). Whether the defendant "knowingly" killed the victim is a question of fact for the jury. See State v. Inlow, 52 S.W.3d 101, 104-05 (Tenn. Crim. App. 2000). The jury may infer intent from the character of the

offense and from all the facts and circumstances surrounding the offense. See id. at 105 (citing State v. Holland, 860 S.W.2d 53, 59 (Tenn. Crim. App. 1993)). If a defendant acts intentionally, meaning he acted with a conscious objective or desire to cause the death of the victim, then the requirement of "knowingly" is met. Tenn. Code Ann. § 39-11-301(a)(2).

The defendant does not deny that he killed the victim, but argues that the State presented insufficient evidence that he *knowingly* killed the victim.[1] He asserts that he "lost it" and attacked the victim in response to her hitting him with her cane, and that he was taking anti-depressant medication at or near the time of the murder.

In the light most favorable to the State, the evidence shows that the defendant strangled the victim for approximately two minutes although she would have been rendered unconscious after eight to twelve seconds. The victim was also struck on the back of the head at least six times, which the medical examiner opined contributed to her death. The testimony at trial established that the defendant was possibly motivated to kill the victim because she wanted him to move out of her house or because she had previously given away some of his father's belongings to which the defendant felt entitled. In addition, the testimony of Samuel Rooker indicated that the defendant had planned to kill the victim in order to get control of her assets. The jury heard the defendant's testimony that he killed the eighty-two-year-old victim, who was blind and unable to walk without assistance, only after she attacked him with her cane and, by its verdict, discredited that testimony. In this regard, it was presented to the jury that the defendant had no bruises or contusions when he was interviewed by police the day after the murder, and the evidence showed that the victim was hit multiple times in the *back* of the head. Although the defendant mentions that he was taking anti-depressant medication at or near the time of the murder, there was no proof that his taking this medication made him incapable of knowing his conduct would result in the victim's death. We conclude that the evidence was sufficient for a rational trier of fact to find that the defendant knowingly killed the victim.

## II. Eviction Letter

The defendant argues that the trial court erred in admitting an eviction letter from the victim to the defendant into evidence as the letter constituted inadmissible hearsay. Citing Tennessee Rule of Evidence 803(3), the defendant asserts that the court inappropriately admitted the letter to prove the defendant's state of mind because the hearsay exception applies to proving the declarant's, in this case the victim's, state of mind. The State, also citing Rule 803(3), argues that the court properly admitted the letter because it reflected the victim-declarant's state of mind.

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). As a general rule, hearsay is not admissible at trial unless it falls under one of the exceptions

---

[1] In his brief, the defendant cites the domestic assault statutory provision, but his argument focuses entirely on his second degree murder conviction.

to the rule against hearsay.  Id. 802.  When an out-of-court statement is not offered for its truth, the statement is non-hearsay and does not fall under the exclusionary rule.  See Neil P. Cohen et al., Tennessee Law of Evidence § 8.01[4][h] (5th ed. 2005).  Non-hearsay can be offered to prove the effect on the listener.  Id. § 8.01[7].  The determination of whether a statement is hearsay lies within the sound discretion of the trial court, and we will not disturb its ruling absent a showing of an abuse of discretion.  State v. Flood, 219 S.W.3d 307, 313 (Tenn. 2007).

Here, it appears that both the defendant and the State have misconstrued the basis for the trial court's introduction of the eviction letter.  In admitting the letter, the trial court stated:

I am going to allow this letter in, not to show the truth of the matter mentioned in the letter.  This serves as notice to vacate my property.  You must be vacated by blank or a FED warrant will be issued.

It's obvious that they should have had a lawyer draft this.  But it will be to show the state of mind of the defendant, whether it's true or not, if he received it.

In other words, it would go to show motive, not to show what she was planning on doing.

We conclude that the trial court did not abuse its discretion in admitting the letter.  The letter was not offered to prove the truth of the matter asserted, that the victim wanted the defendant to vacate the property, but instead it was non-hearsay offered to prove the effect on the defendant-listener which shed light on his possible motive.

### III. Sentencing

The defendant argues that the trial court imposed an excessive sentence.  Specifically, he asserts that the trial court erroneously found that he possessed a deadly weapon during the commission of the offense, failed to find any mitigating factors, and enhanced his sentence without placing its reasons for arriving at the final sentencing decision on the record.

At the sentencing hearing, Jo Ann McBrien, the defendant's sister and victim's daughter, testified that she is scared of the defendant because this was not the first time he had been violent.  She is afraid that he will kill her after he is released from prison.  Teri McBrien, the defendant's niece, testified that the victim thought the defendant was "a golden child" and did whatever she could to take care of him.

In sentencing the defendant, the trial court found three enhancement factors: (1) previous history of criminal convictions based on the defendant's DUI, assault, and vandalism convictions, which the court did not give "a whole lot of weight"; (2) the victim was particularly vulnerable because of her age and physical disabilities, which the court gave "a fair amount of weight"; and (3) the defendant possessed a deadly weapon, a cane, during the commission of the offense, which the

court gave "a fair amount of weight." The court reviewed the mitigating factors and found that none applied. The court imposed a sentence of twenty-three and a half years for the second degree murder conviction and eleven months, twenty-nine days for the domestic assault conviction, to be served concurrently.

When an accused challenges the length and manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record "with a presumption that the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (2006). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing the accused or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994); State v. Bonestel, 871 S.W.2d 163, 166 (Tenn. Crim. App. 1993), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000).

In conducting a *de novo* review of a sentence, this court must consider (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancement factors, (g) any statements made by the accused in his own behalf, and (h) the accused's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, -210 (2006); State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401 (2006), Sentencing Commission Cmts.; Ashby, 823 S.W.2d at 169.

In imposing a specific sentence within a range, a trial court "shall consider, but is not bound by" certain advisory sentencing guidelines, including that the "minimum sentence within the range of punishment is the sentence that should be imposed" and that "[t]he sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors[.]" Tenn. Code Ann. § 40-35-210(c)(1), (2) (2006). The weighing of the various mitigating and enhancement factors is "left to the trial court's sound discretion." State v. Carter, 254 S.W.3d 335, 345 (Tenn. 2008).

The defendant first argues that the trial court erred in finding that he possessed a deadly weapon, a cane, during the murder of the victim. See Tenn. Code Ann. § 40-35-114(9). He asserts that although he admitted hitting the victim with the cane, her cause of death was strangulation. In this regard, the court stated:

> [T]here's no question that he attacked her with a cane as a deadly weapon because a deadly weapon is not just a firearm but anything that in its use or manner of use can

cause serious bodily injury or death. In this case, it did help to cause her death, even though strangulation was the cause of death.

A "[d]eadly weapon" is "[a]nything that in the manner of its use or intended use is capable of causing death or serious bodily injury[.]" Id. § 39-11-106(a)(5)(B) (2006). "Serious bodily injury" is bodily injury involving "(A) [a] substantial risk of death; (B) [p]rotracted unconsciousness; (C) [e]xtreme physical pain; (D) [p]rotracted or obvious disfigurement; or (E) [p]rotracted loss or substantial impairment of a function of a bodily member, organ or mental faculty[.]" Id. § 39-11-106(a)(34) (2006). This court has previously held that a walking cane can constitute a deadly weapon. See State v. Hagan Paul Roberts, II, No. 03C01-9707-CR-00259, 1998 WL 748472, at *4 (Tenn. Crim. App. Oct. 19, 1998), perm. to appeal denied (Tenn. May 3, 1999). We discern no error in the trial court's application of this enhancement factor under the facts of this case.

The defendant next contends that the trial court erroneously failed to find that he satisfied the mitigating factor that he "was suffering from a mental or physical condition that significantly reduced [his] culpability for the offense[.]" See Tenn. Code Ann. § 40-35-113(8). In this regard, the court stated, "I'm urged that he's a sick man and that's why he should be mitigated. And there was proof in the record that he has had illnesses. He testified to some of that. However, I don't see that these illnesses affect him." The record reflects no proof that the defendant's illnesses impacted his ability to formulate intent or reduce his culpability for the offenses. We discern no abuse of discretion in the trial court's declining to find this mitigating factor applicable.

The defendant lastly contends that the trial court enhanced his sentence without placing its reasons for arriving at the final sentencing decision on the record. On the contrary, the record shows the trial court stated its reasons for finding or not finding the various factors and noted which factors it gave "particularly great weight" and not "much weight at all." Moreover, the weighing of various mitigating and enhancement factors is in the trial court's sound discretion, which discretion was broadened by the 2005 amendments to the sentencing act. Carter, 254 S.W.3d at 345. In sum, the record shows that the trial court thoroughly and thoughtfully arrived at a sentence consistent with the purposes and principles of sentencing. The trial court's findings are supported by the record, and we conclude that the defendant's sentence is not excessive.

### IV. Merger

The defendant argues that the trial court erred in failing to merge his domestic assault conviction with his conviction for second degree murder, thus violating his due process rights and protection against double jeopardy. He asserts, relying on State v. Anthony, 817 S.W.2d 299 (Tenn. 1991), that his due process rights were violated because the domestic assault was "essentially incidental" to the second degree murder. He asserts that the dual convictions violate his protection against double jeopardy because the domestic assault occurred at exactly the same time as the murder and the same facts were used to prove both offenses.

In response to the defendant's argument for merger, the trial court stated that the offenses "are separate and distinct crimes because murder has nothing to do with family or household." Thereafter, in ruling on the defendant's motion for new trial, the trial court stated:

[T]he domestic violence assault was complete before the murder.

He repeatedly assaulted her and one can murder someone who is not a relative or a household member. And so, they have completely different elements.

Neither one has to be completed before the other one takes place because of the different elements.

So I find that they are separate crimes[.]

In Anthony, our supreme court heard consolidated appeals to determine whether it violated due process for the defendants to be convicted of both kidnapping and armed robbery. Id. at 300-01. The court observed that "every robbery, by definition, involves some detention against the will of the victim, if only long enough to take goods or money from the person of the victim," but reiterated that "[t]his does not mean that the legislature intended that every robbery should also constitute a kidnapping, even though a literal reading of the statute might suggest otherwise." Id. at 306. The court determined that due process required an inquiry into "whether the confinement, movement, or detention is essentially incidental to the accompanying felony . . . or whether it is significant enough, in and of itself, to warrant independent prosecution." Id.

Our supreme court then modified the Anthony test into a two-part test in State v. Dixon, 957 S.W.2d 532 (Tenn. 1997), a case in which the defendant was convicted of aggravated kidnapping, aggravated assault, and attempted sexual battery. Under Dixon, the first inquiry is "whether the movement or confinement was beyond that necessary to consummate the [accompanying crime]." Id. at 535 (citing Anthony, 817 S.W.2d at 306). The second inquiry is "whether the additional movement or confinement: (1) prevented the victim from summoning help; (2) lessened the defendant's risk of detection; or (3) created a significant danger or increased the victim's risk of harm." Id.[2]

However, in State v. Ralph, 6 S.W.3d 251 (Tenn. 1999), our supreme court addressed a situation where a defendant was convicted of burglary and theft of the same automobile. That defendant argued that the Anthony analysis should apply to his case because the entry into the automobile was merely an essential and incidental step in the theft of the car and not significant, in and of itself, to warrant an independent prosecution when he was also convicted of theft. The court noted that "[u]nlike the kidnapping offense at issue in Anthony, the offenses of burglary and theft

[2] The court addressed merger and due process concerns most recently in State v. Richardson, 251 S.W.3d 438 (Tenn. 2008). After a review of the law, the Richardson the court clarified that the Dixon two-part test was to be used instead of, not in conjunction with, Anthony. Id. at 443.

are defined narrowly by statute and clearly require proof of different elements. Moreover, unlike Anthony, not every theft of a vehicle includes as a practical matter burglary of that vehicle." Id. at 255. The court noted that it had not applied the Anthony analysis outside of the kidnapping context and declined to extend its application to separate convictions of burglary and theft. Id. at 256-57. In light of Ralph, this court has also declined to extend the Anthony analysis beyond the kidnapping context. See, e.g., State v. Cowan, 46 S.W.3d 227, 234-35 (Tenn. Crim. App. 2000); State v. Floyd Perrow, No. M2003-00319-CCA-R3-CD, 2004 WL 193059, at *10-11 (Tenn. Crim. App. Jan. 28, 2004); State v. Reginol L. Waters, No. M2001-02682-CCA-R3-CD, 2003 WL 213777, at *14 (Tenn. Crim. App. Jan. 30, 2003), perm. to appeal denied (Tenn. June 2, 2003).

We likewise decline to extend the Anthony analysis to the offenses at hand. Second degree murder is "[a] knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1) (2006). Domestic assault occurs when a person intentionally, knowingly, or recklessly causes bodily injury to a person who is that person's family or household member. Id. § 39-13-111(b); see id. § 39-13-101(a). In this case, the defendant was capable of beating the victim with a cane without strangling her, just as he was capable of strangling the victim without beating her with a cane. In addition, each offense required proof of different elements. Second degree murder required that the defendant kill the victim; whereas, domestic assault required a domestic relationship between the defendant and the victim. Moreover, even if we were to apply the Anthony, as modified by Dixon, inquiry, the defendant would still not be entitled to relief because beating the victim was beyond that necessary to kill her by strangulation (the main cause of death), and beating the victim certainly would have lessened her ability to summon help. We conclude there was no due process violation in this case.

Turning to the defendant's double jeopardy concern, the Double Jeopardy Clause of the United States Constitution states that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb[.]" U.S. Const. amend. V. Similarly, article I, section 10 of the Tennessee Constitution provides "[t]hat no person shall, for the same offence, be twice put in jeopardy of life or limb." In State v. Denton, 938 S.W.2d 373, 381 (Tenn. 1996), our supreme court established the method for determining whether two offenses were the same for double jeopardy purposes. The first step is to determine, as directed in Blockburger v. United States, 284 U.S. 299, 304, 52 S. Ct. 180, 182 (1932), whether each statutory provision requires proof of an additional fact which the other does not. Denton, 938 S.W.2d at 381. The second step is to analyze the actual evidence used to prove each offense. Id. Third, consider whether there were multiple victims or discrete acts. Id. Fourth, examine the purposes of the respective statutes. Id. The court must also consider each factor in relation to the others. Id.

Looking at the statutory provisions, second degree murder requires that the defendant kill the victim, and domestic assault requires that the victim and the defendant have a domestic relationship. Therefore, each provision requires proof of an additional fact not required by the other. The second step, looking at the evidence used to prove each offense, does not lend a clear outcome. There is evidence that blunt force trauma to the head *contributed* to the victim's death, but the record reflects that the State relied on the act of strangulation to support the murder charge and strangulation was the main cause of death. Third, there was only one encounter between the defendant and the victim,

but arguably discrete acts. By the defendant's own testimony, he beat the victim with a cane and only strangled her once they were on the ground. Fourth, the purpose of both statutes appears to be the prevention of harm to other persons. Considering these factors, we conclude that the dual convictions do not violate the defendant's protection against double jeopardy in this case.

## V. Cumulative Error

The defendant argues that he is entitled to relief based on cumulative error, which deprived him of his due process rights to a fair trial. Discerning no error at trial, we respectfully disagree.

## VI. Other Issue

We note that in the statement of issues in the defendant's brief, he argues that the trial court erred "in admitting numerous photographs of the deceased victim when [he] readily conceded that he was responsible for the victim's death[.]" However, the defendant did not thereafter mention or address this issue in his brief and has thus waived review. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). In any event, we have reviewed the record and discern no error in the trial court's admission of the photographs.

The admissibility of photographs generally lies within the sound discretion of the trial court and will not be overturned on appeal absent a clear showing that the trial court abused its discretion. State v. Faulkner, 154 S.W.3d 48, 67 (Tenn. 2005); State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). "Tennessee courts follow a policy of liberality in the admission of photographs in both civil and criminal cases." State v. Morris, 24 S.W.3d 788, 810 (Tenn. 2000). In determining whether a photograph is admissible, the trial court must first determine whether it is relevant to a matter at issue in the case. See Tenn. R. Evid. 401; State v. Vann, 976 S.W.2d 93, 102 (Tenn. 1998); Banks, 564 S.W.2d at 949. The court must next consider whether the probative value of the photograph is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403.

The record shows that the court went through each photograph and made findings with regard to relevance, probative value, and prejudicial effect. On one photograph in particular, the court was careful to excise a gruesome portion of the photograph, and the court disallowed photographs that it found to be cumulative or overly prejudicial. Moreover, even though the defendant argues that he conceded he was responsible for the victim's death, in his statement to police he only admitted hitting the victim twice and argued the killing was in self-defense. Therefore, many of the photographs were particularly probative to contradict these assertions. While some of the photographs are naturally disturbing, we cannot conclude that the court abused its discretion in determining that the probative value of showing the various injuries inflicted upon the victim and the manner of death overcame any prejudicial effect.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE